UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-CR-133 (MJD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| v. | ) | **POSITION** |
| | ) | |
| KHALID HASSAN MOHAMUD, | ) | |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

The defendant, Khalid Hassan Mohamud, hereby respectfully submits this position on sentencing for the offense of bank robbery, in violation of 18 U.S.C. § 2113(a), following his May 30, 2019 waiver of Indictment, waiver of pretrial motions, and guilty plea to an Information at the earliest possible stage of these federal proceedings.  Mr. Mohamud humbly prays that the Court impose a term of 80 months' imprisonment, concurrent to any time he may receive on his parole violation out of the Third District Court, West Jordan, Utah (Off. No. 193635),[1] as sufficient, but not greater than necessary to serve the statutory ends of sentencing.

---

[1]     On October 14, 2019, the Stearns County Attorney's Office dismissed the underlying state charge of Second Degree Bank Robbery in Stearns County, Minnesota District Court Case No. 73-CR-19-2097.  Mr. Mohamud respectfully requests that the PSR be amended to reflect the dismissal of that case so that it is clear to the Bureau of Prisons that he should receive custody credit back to the date of his original March 17, 2019 arrest for the conduct charged in this federal matter.  (*See* PSR at F.1 ("Release Status"), ¶ 71.)    Mr. Mohamud also respectfully requests that the Judgment order prospective concurrent time on his pending Utah parole violation as it is unclear at this

Mr. Mohamud maintains that the Court should determine his advisory Guidelines range to be 63 to 78 months, based upon a total offense level of 19 (*i.e.*, base offense level of 20 per U.S.S.G. § 2B3.1(a) + 2 per U.S.S.G. § 2B3.1(b)(2) – 3 per U.S.S.G. § 3E1.1) and a criminal history category of VI. As further explained below, Mr. Mohamud respectfully objects to the legal and factual bases underlying the Probation Department's recommendation that his advisory Guidelines range be 151 to 188 months (PSR ¶ 103), as well as that of the government's recommendation of a 77 to 96 month range (ECF 27 at 2).

That said, in seeking a concurrent sentence of 80 months notwithstanding his position on the advisory Guidelines range, Mr. Mohamud acknowledges that such a significant punishment is warranted for his conduct and accepts full responsibility for his actions. A concurrent 80-month sentence is appropriate given the nature and circumstances of this relatively unsophisticated and non-violent bank robbery, Mr. Mohamud's history and characteristics as a Somali refugee fleeing violence and poverty, his struggles to adjust to life in America without a father, his untreated mental health and chemical dependency issues, and the need to avoid unwarranted sentencing disparities.

---

point how much time in that case he will be facing and whether the Bureau of Prisons will consider the detainer in that case a bar to custody credit and/or programming while he is in federal custody. *See* 18 U.S.C. § 3584 ("if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively[,]" and "[t]he court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)").

## II. 18 U.S.C. § 3553(a) FACTORS SUPPORTING A CONCURRENT 80-MONTH SENTENCE

### A. Applicable Guidelines Range (18 U.S.C. § 3553(a)(4))

#### 1. Burden of proof

The government bears the burden of proving the factual and legal bases used to justify sentencing enhancements under the Guidelines.  *See, e.g., United States v. Mitchell*, 825 F.3d 422, 425 (8th Cir. 2016) ("Application of sentencing enhancements must be supported by a preponderance of the evidence, and the government has the burden to prove the factual basis for an enhancement."  (Citing *United States v. Cochrane*, 608 F.3d 382, 383 (8th Cir. 2010))); *United States v. Ossana*, 679 F.3d 733, 735 (8th Cir. 2012) ("it was the government's burden to prove Ossana's prior conviction stemmed from a violation of a subsection qualifying as a crime of violence" under the Guidelines).  Moreover, "[i]f a defendant objects to factual allegations contained in the Presentence Investigation Report (PSR), a district court may not adopt the PSR's challenged facts until the defendant's objections have been heard and the government proves by a preponderance of the evidence that the facts stated in the PSR are accurate."  *United States v. Logan*, 54 F.3d 452, 455 (8th Cir. 1995) (citing *United States v. Greene*, 41 F.3d 383, 386 (8th Cir. 1994); Fed. R. Crim. P. 32(c)(1)); *see also United States v. Merritt*, 982 F.2d 305, 306 (8th Cir. 1992) (burden of proof is on the government when asserting a sentence should be enhanced).

**2. Objection to Probation recommendation of two-level "threat of death" enhancement (U.S.S.G. § 2B3.1(b)(2)(F)) and consideration of the nature and circumstances of the offense (18 U.S.C. § 3553(a)(1))**

Mr. Mohamud respectfully objects to the legal basis for the Probation Department's recommendation of a two-level "threat of death" enhancement pursuant to U.S.S.G. § 2B3.1(b)(2)(F). (PSR ¶ 16; PSR Addendum at A.1-A.2.) In the alternative, Mr. Mohamud respectfully prays that the Court consider the arguments set forth *infra* as grounds to impose an 80-month sentence as sufficient, but not greater than necessary in consideration of the nature and circumstances of this offense per 18 U.S.C. § 3553(a)(1).

Application note 6 of U.S.S.G. § 2B3.1 provides the following examples of a "threat of death" qualifying for the two-level enhancement:

- "Give me the money *or I will kill you*";

- "Give me the money *or I will pull the pin on the grenade I have in my pocket*";

- "Give me the money *or I will shoot you*";

- "Give me your money *or else* (where the defendant *draws his hand across his throat in a slashing motion*)"; or

- "Give me the money *or you are dead*[.]"

U.S.S.G. § 2B3.1, App. n.6 (emphases added). The facts of the offense conduct in this case are not controverted. (PSR ¶¶ 5-6.) By contrast to the foregoing examples, the undisputed facts herein indicate that Mr. Mohamud's conduct did not include a threatened alternative, *e.g.*, "Give me the money or I will _____" as in the foregoing list.

Instead, Mr. Mohamud provided the teller a note that stated, "This is a robbery, don't do anything stupid I have 2 weapons on me, I need $100's, $50's only." (PSR ¶ 6.) Moreover, and significantly in light of the Eighth Circuit case law relied upon by the government in its position pleading (ECF 27 at 5-6), Mr. Mohamud did not *place* his hands in his pockets in an obvious gesture to indicate that he was holding weapons, but instead merely "***had*** his hands in his pockets ***which made it difficult for victim teller KAB to determine if he was concealing a weapon on his person***." (PSR ¶ 6 (emphases added).) Notably, there is no evidence that Mr. Mohamud ever actually had a weapon. Indeed, still photographs taken of Mr. Mohamud from the bank surveillance video do not depict him placing his hands in such a way as to indicate that he was holding weapons in his pockets, which is consistent with the teller being unable to determine if he was concealing a weapon on his person:



In asking the Court to apply the two-level enhancement, the government attempts to analogize this case to *United States v. Smith,* 973 F.2d 1374 (8th Cir. 1992). (ECF 27 at 6-7.) The facts and reasoning of *Smith*, however, are distinguishable to a degree that instead counsels against application of the enhancement. In *Smith*, the Eighth Circuit found that the enhancement properly applied because—after handing the teller a note stating, "Please give me all your hundreds, fifties and twenties"—the defendant responded to the teller's question, "Is this a joke?", by "***put[ting]*** his right hand under his coat lapel as if he might be concealing a weapon and [stating], 'You don't want to find out.'" 973 F.2d at 1375 (emphasis added). In upholding the District Court's application of the two-level enhancement, the Eighth Circuit approvingly cited decisions by the Ninth Circuit, on the one hand, and the Eleventh Circuit on the other. *Id.* at 1378 (comparing *United States v. Strandberg*, 952 F.2d 1149, 1151-52 (9th Cir. 1991) (upholding where statement was "not to pull the alarm ***or*** 'my friend will start shooting'") and *United States v. Eaton,* 934 F.2d 1077, 1079 (9th Cir. 1991) (upholding where demand note stated "Give Me All Your Money ***or*** I'll Shoot") with *United States v. Tuck*, 964 F.2d 1079 (11th Cir. 1992) (no express threat of death where defendant, who had no weapon and did not pretend to have a weapon, told the teller, who, after completing the robbery, that if she did anything funny he would be back).

In particular, the Eighth Circuit quoted the Eleventh Circuit's analysis in *Tuck* that, although the defendant's threat "***implied physical harm, and may well have implied death***[,]" it was "simply not direct, distinct or express" and, "[u]nlike the threats to shoot

in the Ninth Circuit cases, . . . [was] made without a weapon, was not express that he intended to engage in conduct that would cause death or put the teller in a reasonable apprehension of the loss of her life." *Smith*, 973 F.2d at 1378 (quoting *Tuck*, 964 F.2d at 1081). The Court of Appeals then noted that the combination of Smith's "threatening the teller with the statement 'You don't want to find out' and the appearance as if he had a gun under his coat . . . constituted an express threat of death and instilled greater fear than necessary to carry out the robbery[,]" reasoning that "Smith went beyond the defendant in *Tuck* because Smith appeared as if he might have a gun under his coat" and his "threat was immediate[,]" *i.e.,* "if the teller did not comply, he would carry out his threat." *Ibid.* The Eighth Circuit further explained that "[t]he defendant's threat in *Tuck*, on the other hand, was indefinite: sometime in the future he might come back." *Ibid.*

Here, Mr. Mohamud's conduct is far closer to that of the defendant in *Tuck* than the defendants in *Smith, Strandberg*, or *Eaton*. Like Mr. Tuck, Mr. Mohamud's note—even assuming *arguendo* as in *Tuck* that it "implied physical harm, and may well have implied death"—nevertheless did not convey a threat that was "direct, distinct or express" insofar as there is no evidence that he ever actually had a weapon and the note did not expressly state that Mr. Mohamud intended to engage in conduct that would cause death or put the teller in a reasonable apprehension of the loss of her life. *Tuck*, 964 F.2d at 1081. Moreover, unlike Mr. Smith, Mr. Mohamud did not "put his right hand under his coat lapel as if he might be concealing a weapon" while verbally stating a threat ("You don't want to

find out"), nor did Mr. Mohamud's note provide direct, distinct, and express threats that "my friend will start shooting" or "I'll shoot" as in *Strandberg* and *Eaton*.

Indeed, it is doubtful that Mr. Mohamud's conduct is of a nature "that would instill in a reasonable person, who is a victim of the offense, a fear of death"—as Application note 6 states the specific offense characteristic is intended to sanction—given that the teller here indicated some doubt as to whether it appeared that Mr. Mohamud actually even had a weapon, "activated the silent alarm, placed the money into an envelope, and refused to return the demand note when asked."   (ECF 27 at 3.)   Aside from offering the referenced note and asking for it back, Mr. Mohamud said and did nothing during the robbery other than to quietly leave the bank.   Mr. Mohamud neither brandished or otherwise used any weapon (there never was one), nor did he act in any other violent or threatening manner throughout the incident.

Based on the foregoing, Mr. Mohamud respectfully objects to the application of the two-level U.S.S.G. § 2B3.1(b)(2)(F) enhancement in this case.   Alternatively, given the arguments set forth *supra*, Mr. Mohamud asks the Court to impose a concurrent 80-month sentence as sufficient, but not greater than necessary in light of the mitigated and unsophisticated[2] nature and circumstances of the offense in comparison to the spectrum of far more violent and dangerous bank robbery offenses charged federally.   *Cf. United*

---

[2]   As noted by the government in its position pleading, Mr. Mohamud made no real attempt to cover his tracks, but rather "used his brother's Lyft account to call a ride-share in order to take him to the bank, for the purposes of the robbery, and back to his [uncle and aunt]'s home."   (ECF 27 at 10.)

*States v. Baker*, 339 F.3d 400, 405–06 (6th Cir. 2003) (facts did not support an upward departure for physical injury because "[a]ppalling as the defendants' conduct and its consequences were by the standards of any civilized person, it is no extreme outlier within the universe of robberies resulting in permanent or life-threatening injuries, for surely every such robbery is appalling"); *United States v. Bond*, 22 F.3d 662, 671–72 (6th Cir. 1994) (reversing the District Court's decision to depart because, as a result of the bank robbery, "the tellers suffered anxiety for several weeks after the robbery; but this would not be unusual for any victim of an armed bank robbery"); *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (affirming a downward variance to probation in a case involving the sale of counterfeit access cards in violation of the Digital Millennium Copyright Act based in part on the District Court's finding that the defendant's crime "[di]d not pose the same danger to the community as many other crimes").

### 3. Objection to Probation Recommendation of Career Offender Enhancement

Mr. Mohamud respectfully objects to the factual and legal bases for the Probation Department's recommendation of the U.S.S.G. § 4B1.1 career offender enhancement, and he moves to strike all factual and legal allegations that serve as the basis for that recommendation from the PSR. (PSR ¶¶ 23, 60-61; PSR Addendum at A.1-A.2.)

### a.   Legal standards

### i.   Career offender

A defendant is a career offender if:

(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction;

(2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and

(3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4A1.1(a).   For present purposes, the relevant definition of a "crime of violence" includes an "offense under federal or state law, punishable by imprisonment for a term exceeding one year, that":

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another [(*i.e.,* the "force" clause)], or

(2) is . . . aggravated assault [(*i.e.*, the "enumerated" clause).]

U.S.S.G. § 4B1.2(a).

### ii.   The categorical and modified categorical approaches

Courts determine whether a prior conviction qualifies as a "crime of violence" by using the categorical approach.  *See, e.g., United States v. Malagon-Soto,* 764 F.3d 925, 927 (8th Cir. 2014).   This approach "generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense."  *Taylor v. United States*, 495 U.S. 575, 602 (1990); *see also Kelly v. United States*, 819 F.3d 1044, 1047-48

(8th Cir. 2016) (applying the categorical approach to an analysis of predicate offenses for Guidelines purposes). So courts "focus[] on the statutory elements[3] of the offense rather than the particular facts underlying the defendant's prior conviction." *United States v. Forrest*, 611 F.3d 908, 909-10 (8th Cir. 2010).

The focus on the statute's elements requires that a prior conviction ***necessarily*** satisfies the federal definition. This high showing—namely, that a prior conviction must necessarily fit within the respective "crime of violence" definition—emerges from the cases creating the categorical and modified categorical approaches. *Taylor*, 495 U.S. at 599, 601; *Shepard v. United States*, 544 U.S. 13, 20-21, 23 n.4, 24, 26 (2005). To ensure that a conviction under the statute is necessarily a predicate, courts must assume the least-culpable conduct criminalized by the statute and analyze whether that amounts to a "crime of violence." *See, e.g., Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013); *Johnson v. United States*, 559 U.S. 133, 137 (2013); *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) ("But if the crime of conviction covers *any more* conduct than the generic offense, then it is not an ACCA 'burglary'—even if the defendant's actual conduct (*i.e.*, the facts of the crime) fits within the generic offense's boundaries." (Emphasis added.)); *United States v. McArthur,* 850 F.3d 925, 940 (8th Cir. 2017).

The modified categorical approach is used only in a "narrow range of cases," and then only as a "tool for implementing the categorical approach." *Descamps v. United*

---

[3]     An element of a crime is a fact that must be proven beyond a reasonable doubt in order to convict a defendant. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000).

*States*, 133 S. Ct. 2276, 2283-84 (2013).   This narrow range of cases involves statutes that are potentially "overbroad" and have "alternative elements"—that is, a statute that has one or more sets of elements that qualify as a "crime of violence" and other sets that do not. *Descamps*, 133 S. Ct. at 2283.   Such statutes are divisible because they may be divided up between their alternative elements.   The modified categorical approach can be used only in these statutes.   And even then, it is used only "as a tool for implementing the categorical approach" by examining "a limited class of documents," such as indictments and plea colloquies, to determine "which of a statute's alternative elements formed the basis for the defendant's prior conviction."   *Descamps*, 133 S. Ct. at 2284.

So the modified categorical approach may be employed only with respect to alternative elements and only for the purpose of determining on which alternative element the conviction was based.   *Descamps*, 133 S. Ct. at 2277, 2281, 2284-85, 2287, 2291; *Mathis*, 136 S. Ct. at 2256.   Once the court has determined the alternative element on which the conviction was based, it then uses the categorical approach to determine whether a conviction on that element (along with the other elements of the crime) fits within the federal definition.   As *Mathis* put it, if the "listed items" in an "alternatively phrased statute" are elements rather than means, then "the court should do what we have previously approved:   review the record materials to discover which of the enumerated alternatives played a part in the defendant's prior conviction, and then compare that element (along with all others) to those of the generic crime."   *Mathis*, 126 S. Ct. at 2256.   "But if [the alternative possibilities] instead . . . are means, the court has no call to decide which of the

12

statutory alternatives was at issue in the earlier prosecution. . . . [T]he court may ask only whether the elements of the state crime and generic offense make the requisite match." *Id.* at 2256 (internal citations omitted).

### iii.     Divisibility analysis

This threshold inquiry—elements-or-means—was easy in *Mathis* because state case law had resolved the issue:   the Iowa Supreme Court had held that the listed premises in Iowa's burglary law "are 'alternative methods' of committing one offense, so that a jury need not agree whether the burgled location was a building, other structure, or vehicle. When a ruling of that kind exists, a sentencing judge need only follow what it says." *Id.* at 2256 (quoting *State v. Duncan*, 312 N.W.2d 519, 523 (Iowa 1981)).

But if state case law does not resolve the elements-or-means question, then *Mathis* directs the courts to turn to the statute's face for resolution. *Mathis* described three ways in which a court may do so.   First, "[i]f statutory alternatives carry different punishments, then under *Apprendi* they must be elements."   *Ibid.*   Second, "if a statutory list is drafted to offer 'illustrative examples,' then it includes only a crime's means of commission." *Ibid.*   Finally, "a statute may itself identify which things must be charged (and so are elements) and which need not be (and so are means)."   *Ibid.*

Only when state law fails to provide clear answers and the statute, on its face, is unclear, may courts take a "peek at the record documents" for the "limited purpose of determining whether the listed items are elements of the offense." *Id*. at 2256-57. If a court still cannot tell whether alternatives are elements or means then the tie goes to the defendant, and the prior conviction is not a predicate. *Id*. at 2257.

> **b.** **Utah Third Degree Aggravated Assault by Prisoners is indivisible.**

Here, applying the *Mathis* principles, the alleged predicates for the Probation Department's career offender recommendation—two 2011 convictions for Third Degree Aggravated Assault by Prisoners, both in violation of U.C.A. § 76-5-103.5 (PSR ¶¶ 23, 60-61)—are based on an indivisible statute. Since 2006, U.C.A. § 76-5-103.5 has provided as follows:

> Any prisoner who commits aggravated assault not amounting to a violation of Section 76-3-203.6 is guilty of:
>
> (1) a second degree felony if no serious bodily injury was intentionally caused; or
>
> (2) a first degree felony if serious bodily injury was intentionally caused.

U.C.A. § 76-5-103.5. Curiously, though the plain language of § 76-5-103.5 provides for only a second degree or first degree felony conviction, depending on whether serious bodily injury was intentionally caused, the PSR alleges without explanation that the relevant convictions were both for "***Third Degree*** Aggravated Assault by Prisoners." (PSR ¶¶ 23, 60-61 (emphasis added).)

14

That unexplained issue aside, Third Degree Aggravated Assault was defined in the

2011 version of U.C.A. § 76-5-103 as follows:

> (1) A person commits aggravated assault if the person commits assault as defined in Section 76–5–102 and uses:
>
> > (a) a dangerous weapon as defined in Section 76–1–601; or
> >
> > (b) *other means* or force likely to produce death or serious bodily injury.
>
> (2)(a) A violation of Subsection (1) is a third degree felony, except under Subsection (2)(b).

U.C.A. § 76-5-103 (2011) (emphasis added).  Assault, per the 2011 version of U.C.A.

§ 76-5-102, in turn provided:

> (1) Assault is:
>
> > (a) an attempt, with unlawful force or violence, to do bodily injury to another; or
> >
> > (b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or
> >
> > (c) an act, committed with unlawful force or violence, that causes bodily injury to another or *creates a substantial risk of bodily injury to another*.
>
> (2) Assault is a class B misdemeanor.

U.C.A. § 76-5-102 (2011) (emphasis added).

With regard to divisibility, *Mathis* recognized that a statute may "enumerate[ ]

various factual means of committing a single element . . . or otherwise said, spells out

various factual ways of committing some component of the offense."   136 S. Ct. at 2249.

15

This is true here.   Just as U.C.A. § 76-5-102(1) lists the factual ways by which a simple assault may be committed, U.C.A. § 76–5–103(1) recites the means by which the commission of simple assault is elevated to aggravated assault.   The Utah Court of Appeals confirms that the alternative provisions of § 76–5–103(1) specify means, not elements:   "To find aggravated assault, the jury must first find an assault occurred.   It must then decide if the assault was carried out with a dangerous weapon or other means likely to produce death or serious injury."   *State v. Tinoco*, 860 P.2d 988, 990 (Utah Ct. App. 1993).   In a more recent case, that same court stated that, in cases charging a defendant with third degree felony aggravated assault, the state bears "the burden of proving beyond a reasonable doubt that [the defendant] committed an assault either (1) with a dangerous weapon or (2) by means or force likely to cause death or serious bodily injury."   *State v. Yazzie*, 402 P.3d 165, 168 (Utah Ct. App. 2017).   In addition to foregoing state case law indicating indivisibility, it is noteworthy that the statutory alternatives for Utah aggravated and simple assault (*i.e.*, dangerous weapon versus other means or force, and attempt versus threat versus act) do not carry different punishments and that the statutory list appears drafted to offer illustrative examples, both of which further demonstrate indivisibility.   *Mathis*, 126 S. Ct. at 2249, 2256 (expressly acknowledging that the use of the disjunctive "or" could be found in lists of alternative means, rather than only in lists of alternative elements).

Having shown that the subject statute is indivisible, the question becomes whether the alternative means set forth therein are the same or narrower than the "force" and "enumerated" clause definitions of a "crime of violence" set forth in U.S.S.G. § 4B1.2(a)

> ### c. Utah Third Degree Aggravated Assault by Prisoners is categorically broader than the "force" clause.

Utah Third Degree Aggravated Assault by Prisoners is not a "crime of violence" under the "force" clause for the following three reasons.

*First*, as defined by Utah state law, the least culpable conduct criminalized by the subject statute allows for convictions where a defendant commits an assault and uses "other means" instead of "force likely to produce death or serious bodily injury." U.C.A. § 76-5-103(1)(b). By extending the reach of the statute to include this plain language, Utah criminalizes conduct as aggravated assault that does not necessarily include as an element the use, attempted use, or threatened use of physical force against the person of another, as required by U.S.S.G. § 4B1.2(a)(1). If Utah legislators had intended aggravated assault to require in all cases the use of violent physical force—the requisite "violent force" needed for application of the "force" clause, *i.e.,* "force capable of causing physical pain or injury to another person[,]" "a substantial degree of force" that connotes "strong physical force," *Curtis Johnson v. United States*, 559 U.S. 133, 140-43 (2010)—they would *not* have included the use of "other means" as falling within the scope of the statute. The Utah statute is therefore categorically broader than the "force" clause, and the analysis should end there *ab initio*.

*Second,* the simple assault element, U.C.A. § 76-5-102, that is necessary to prove Third Degree Aggravated Assault by Prisoners likewise does not fall under the "force" clause because it extends to acts that merely "create[] a substantial risk of bodily injury to another."  U.C.A. § 76-5-102(1)(c).  Note the similarity between the foregoing language and the "residual" clause invalidated by *Johnson v. United States*, 135 S. Ct. 2551 (2015) and its progeny.  Indeed, the Eighth Circuit has held under analogous circumstances that, "[i]f a statute only requires the government to prove that a defendant created a risk of harm to another, it does not qualify as a violent felony under the force clause because the government need not prove violent physical force." *United States v. Jordan*, 812 F.3d 1183, 1186 (8th Cir. 2016) (citations omitted).  In *Jordan,* the Court of Appeals held that, "[b]ecause subsection (a)(1) of Arkansas' aggravated assault statute only requires the government to prove that a defendant's conduct created 'a substantial danger of death or serious physical injury' it does not qualify as a violent felony under the force clause."[4]  *Id.* at 1186–87.  As in *Jordan,* because the Utah simple assault definition at issue here merely requires proof that a defendant created a substantial risk of bodily injury to another, the

---

[4]     Given the similar definitions of the term "violent felony" from the Armed Career Criminal Act ("ACCA") and the term "crime of violence" from the Guidelines— particularly as to the "elements" or "force" clauses of 18 U.S.C. § 924(e)(2)(B)(i) and U.S.S.G. § 4B1.2(a)(1)—courts have treated authority interpreting a "violent felony" as applicable in interpreting a "crime of violence." *United States v. Olsson*, 742 F.3d 855, 855 n.1 (8th Cir. 2014) (applying *Descamps v. United States*, 133 S. Ct. 2276 (2013)—an ACCA case clarifying the modified categorical approach—to the Guidelines).

Third Degree Aggravated Assault by Prisoners is categorically broader than the "force" clause.

*Third,* the Eighth Circuit has recently and specifically analogized Utah's aggravated assault statute to a North Dakota aggravated assault statute that it held was categorically broader than the "force" clause. In *United States v. Schneider,* 905 F.3d 1088 (8th Cir. 2018), the Court of Appeals observed that "only eighteen states—North Dakota among them—allow for [aggravated assault] convictions based on ordinary recklessness[,]" and cited U.C.A. § 76-5-103 in finding that Utah is also one such state. 905 F.3d at 1094–95 n.4. Indeed, the *Schneider* court expressly cited the Utah Court of Appeals' ruling in *State v. Fahina*, 400 P.3d 1177, 1183 n.1 (Utah Ct. App. 2017) as "noting that a defendant can commit aggravated assault recklessly[.]" *Ibid.* The Eighth Circuit held that the analogous North Dakota aggravated assault statute—which likewise allowed for conviction of persons acting "recklessly"—was categorically broader than the "force" clause because it criminalized reckless driving, which does not require physical force. *Id.* at 1091–92 ("A statute that criminalizes reckless driving cannot satisfy the force clause.") Here, the Utah Third Degree Aggravated Assault by Prisoners statute uses overbroad language similar to that of the North Dakota statute in *Schneider* by including within its purview acts an acts creating a substantial risk of bodily injury to another where a defendant uses "other means[.]" U.C.A. §§ 76-5-102(1)(c), 76-5-103(1)(b). As such, and consistent with the Eighth Circuit's holding in *Schneider*, this Court should find that the statute is categorically broader than the "force" clause.

### d. Utah Third Degree Aggravated Assault by Prisoners is categorically broader than the "enumerated" clause.

Utah Third Degree Aggravated Assault is categorically broader than generic aggravated assault, as included in the "enumerated" clause, because it allows for conviction based upon a *mens rea* of ordinary recklessness.

The Supreme Court has long held that "enumerated" offenses do not refer to whatever conduct a state happens to call "aggravated assault" or any of the other listed crimes. *Schneider,* 905 F.3d at 1092–93 (citing *Descamps*, 570 U.S. at 257; *Taylor*, 495 U.S. at 590–92; *Ossana*, 638 F.3d at 899 (extending the Supreme Court's interpretation of the Armed Career Criminal Act ("ACCA") to the Guidelines). Instead, the "enumerated" clause "incorporates the 'generic, contemporary' meaning of those offenses, a 'uniform definition independent of the labels employed by the various States' criminal codes.'" *Id.* at 2093 (citing *Taylor*, 495 U.S. at 592, 598). The question, therefore, is whether Utah Third Degree Aggravated Assault by Prisoners counts as "generic" aggravated assault.

In *Schneider*, the Eighth Circuit held that, because the subject North Dakota statute—which it analogized to U.C.A. § 76-5-103—allowed for convictions based on ordinary recklessness, it did not satisfy the mental-state requirement for generic aggravated assault. 905 F.2d at 1095 (citation omitted). The Court of Appeals reasoned that "[t]he least culpable mental state listed in the Model Penal Code's definition of aggravated assault is 'reckless[ness] under circumstances manifesting extreme indifference to the value of human life[,]'" which is "different from ordinary recklessness" and serves "as the dividing

line between simple and aggravated assault." *Id.* at 1094 (citations omitted). The Eighth Circuit observed that its holding was the same conclusion as reached by "three other circuits[,]" which have "relied on the Model Penal Code and the majority rule among the states in concluding that ordinary recklessness does not satisfy the mental-state requirement for generic aggravated assault." *Id.* at 1095 (citing *United States v. Barcenas-Yanez*, 826 F.3d 752, 756-58 (4th Cir. 2016); *United States v. McFalls*, 592 F.3d 707, 717 (6th Cir. 2010), *abrogated on other grounds by Voisine v. United States*, 136 S.Ct. 2272 (2016); *United States v. Esparza-Herrera*, 557 F.3d 1019, 1024-25 (9th Cir. 2009) (*per curiam*)).

Here, a conviction of Utah Third Degree Aggravated Assault by Prisoners does not require any awareness as to the certainty or likelihood of any particular outcome; it merely necessitates an awareness, knowledge, or perception of a risk that the result will occur. *See* U.C.A. § 76-2-103(1)(b). While Utah recklessness requires perception of a risk first and then a deliberate disregard of that knowledge, Utah courts have said this knowledge-disregard duality is *not* required to sustain a conviction for third degree aggravated assault, which distinguishes the Utah "ordinary recklessness" *mens rea* from the generic "extreme indifference" *mens rea. See State v. Salt,* 347 P.3d 414, 420 (Ut. Ct. App. 2015) ("specific intent to inflict serious bodily injury—or knowledge that such injury is likely to occur—is not required for a third degree felony aggravated assault conviction").

Thus, this Court should rule consistent with the Eighth Circuit's analysis in *Schneider* that Utah Third Degree Aggravated Assault by Prisoners encompasses an ordinary recklessness state of mind that is broader than the extreme-indifference *mens rea*

inherent to generic aggravated assault, such that it does not fall within the purview of the "enumerated" clause. In light of the foregoing, the Court should sustain Mr. Mohamud's factual and legal objection to the Probation Department's career offender recommendation, and instead determine his advisory Guideline range to be 63 to 78 months.

**B.    The History and Characteristics of Mr. Mohamud (18 U.S.C. § 3553(a)(1))**

**1.    Traumatic early years fleeing civil war**

Now 28 years old, Mr. Mohamud was born in 1990 in Somalia. Within a year of his birth, the dictator Mohammed Siad Barre, who had ruled the Somali Democratic Republic since 1969, was forced to flee when the capital of Mogadishu was captured by rival clan militias. Annabel Hogg, *Timeline:    Somalia, 1991-2008*, *available at* https://www.theatlantic.com/magazine/archive/2008/12/timeline-somalia-1991-2008/307190/ (last visited Nov. 5, 2019). A power struggle between two warring clan lords ensued, resulting in the killing and wounding of thousands of Somali civilians. *Ibid.* By 1992, an estimated 350,000 Somalis had died of disease, starvation, or civil war, and the United States and U.N. Security Council began emergency airlifts of food and supplies to Somalia and tried to help the starving country by protecting food shipments from warlords. *Ibid.* In 1993, Somali rebels shot down two U.S. helicopters, and a heated battle followed, resulting in the deaths of hundreds of Somali civilians, 18 U.S. Army Rangers, and one Malaysian man. *Ibid.* The United States formally ended its mission in

Somalia in 1994, and Somalis suffered heavily in the following years due to dictator rule and warlord infighting.  *Ibid.*

By the time Mr. Mohamud turned five in 1995, his biological father (of whom Mr. Mohamud has no memory and about whom his mother has not spoken) had been killed and his mother tried to escape the violence, chaos, and poverty of Somalia with Mr. Mohamud and his four young sisters.   The family fled to a refugee camp in Kenya, Africa and there awaited relief while hoping for a new life in the United States.   Life in the Kenyan refugee camp—a barren, dusty settlement where Somali refugees were isolated from Kenyan society—was extremely traumatic and difficult for Mr. Mohamud and his family.   He was hit by rocks and knives by other children and adults living around them, and he learned early on that he had to be tough in order to survive.



(*Dadaab, the world's biggest refugee camp, located in eastern Kenya, was at one time said to be home to half a million people and the third largest city in Kenya after Nairobi and Mombasa.*  Photographs: Tony Karumba/AFP/Getty Images, P. Moumtzis/UNHCR, T. Bølstad/UNHCR.  *See* Asad Hussein, *I grew up in the world's biggest refugee camp – what happens when it closes?*, available at https://www.theguardian.com/world/2016/sep/23/kenya-dadaab-refugee-camp-what-

happens-when-it-closes-asad-hussein (last visited Nov. 5, 2019); Moulid Hujale, *Life in Dadaab:  three generations of refugees isolated from Kenyan society, available at* https://www.theguardian.com/global-development/2016/jan/27/life-dadaab-three-generations-of-refugees-isolated-from-kenyan-society (last visited Nov. 5, 2019); The Guardian, *Dadaab refugee camps in Kenya, 20 years on – in pictures*, *available at* https://www.theguardian.com/global-development/gallery/2011/mar/24/dadaab-refugee-camps-in-pictures (last visited Nov. 5, 2019).)

Mr. Mohamud's memories of this time are few, or perhaps deeply suppressed.   But it is fair to say that, by the time Mr. Mohamud and his family emigrated from Africa to Salt Lake City, Utah in July of 2001, he had spent the first 11 years of his life immersed in war, poverty, famine, and struggling to survive in extremely desperate circumstances.

### 2.        Maladjustment to life in America without a father

It would be an understatement to say that Mr. Mohamud had a difficult time adjusting to life in the United States.   He had no father figure in his home, just uncles who did not provide him a consistent role model.   The most guidance they offered were severe whuppings with a belt, switch, or anything else that was around.   His mother struggled to raise the six kids she ultimately had, working three jobs and therefore frequently leaving the children to care for themselves and each other.   Mr. Mohamud doesn't remember seeing his mother much growing up, as she was always out housecleaning, working at hotels, and stocking at Walmart.   He felt more like a "grandma's kid," as his grandmother—who recently passed away in April of 2018—was more affectionate toward

him, while his mother focused more on his sisters.   Money was tight in Mr. Mohamud's house growing up.   He never missed meals, but they were often slim, and adequate clothing was scarce.

Instead of finding guidance in the home, Mr. Mohamud sought kinship and comradery with other young men who also came from difficult financial and social circumstances, many of whom were refugee kids who (like Mr. Mohamud) didn't speak English well and struggled with their identities in a new country.   The unresolved trauma they carried with them from overseas was an unspoken history they shared.   There were "a lot of gangs" in the neighborhood Mr. Mohamud grew up in, and he found himself falling in with "a bunch of refugee kids in the same apartment complex."   Far from escaping the chaos of Somalia and the Kenyan refugee camp, Mr. Mohamud was exposed to further violence and dysfunction in Utah, where he was only 12 when he saw another kid get shot.   There was a "heavy drug presence" all around—cocaine, heroin, weed, and alcohol.   It is not surprising that these challenges soon led Mr. Mohamud to placements in juvenile hall.   *See* Betancourt *et al.*, *We left one war and came to another:   resource loss, acculturative stress, and caregiver-child relationships in Somali refugee families, available at* https://psycnet.apa.org/doiLanding?doi=10.1037%2Fa0037538 (last visited Nov. 5, 2019) ("Refugee families often encounter a number of acculturative and resettlement stressors as they make lives for themselves in host countries. These difficulties may be compounded by past trauma and violence exposure, posing increased risk for mental health problems.")

### 3.    Reflection, remorse, and hope for the future

Mr. Mohamud remembers his mother's disappointment that he had turned to the streets and kept getting into trouble.   She has never visited him in custody.   But he admits he "didn't put weight behind her words because he didn't feel the love" from her—instead, he felt only love from the brotherhood he found in his neighborhood friends.

This is not to say that Mr. Mohamud had no attachment to prosocial activities as a youth.   He made it all the way to his senior year at Granger High School in West Valley, Utah and was 2 credits away from graduating before he got into trouble and couldn't finish. He was not a terrible student – he had a grade point average of 2.02, impressive considering that he recalls learning English by watching cartoons, in addition to ESL classes.   But he had a high number of unexcused absences, detention days, tardies, and suspensions.   At the age of 14, Mr. Mohamud had an individual education plan to address his many issues.

The end of his scholastic career before graduating was particularly unfortunate because he had found some solace in playing football in junior high and high school, becoming involved through an older cousin.   But Mr. Mohamud remembers his mother and family never came to his games.   "If I had played soccer, they would've come," he says.   Mr. Mohamud did ultimately obtain his diploma from Davis Adult School in Farmington, Utah.

Abuse of alcohol and marijuana complicated Mr. Mohamud's already compromised and juvenile decision-making and contributed to his legal issues, starting at the age of 11

or 12, and experimentation with other drugs, like mushrooms, followed.  Mr. Mohamud has recognized that his abuse of alcohol, in particular, has contributed to his poor choices:

> *Alcohol makes me irresponsible, I just sit around and drink.  I don't want to drink no more.  Something's gotta change, I am getting old, I don't want to get locked up no more.  I drink to escape reality instead of facing reality and being responsible.*

In that connection, Mr. Mohamud has been highly self-critical and expressed sincere remorse in reflecting upon and taking responsibility for his offense conduct in this case, stating during the PSR interview:

> *I take full responsibility and apologize to the community, especially the bank.  I am sorry for my crime.  I chose to rob the bank because I was lazy—I didn't have a job, and I picked the easy way out.  I chose the bank because of where my uncle and aunt lived.  I did not case the bank in advance.*

Before committing this crime, Mr. Mohamud worked briefly in April and May of 2018, providing shipping and handling in Cold Spring, Minnesota at Pilgrim's Pride Chicken Distribution Center before issues with his social security card prevented him from continuing.  He previously held employment in Utah in warehouse positions.  In the future, he would like to learn welding, electrical engineering, or heavy machinery.  He asks for a recommended designation in or near Minnesota, so that he can be as close to his family as possible.  When he was last released from prison in Utah, he found that his entire family, with the exception of one uncle, had relocated to Minnesota.  Upon release, he hopes to live in Burnsville, where his grandmother is buried, so that he can be close to her.

District Courts have commonly granted sentencing reductions where, as here, a defendant grew up in poor economic circumstances and was otherwise exposed to extreme drugs, violence, and poverty. *See, e.g.*, *United States v. Samuels*, No. S1 08 CR. 08-03(RWS), 2009 WL 875320, at *4 (S.D.N.Y. Apr. 2, 2009) (imposing a time-served sentence rather than Guideline range of 70 to 87 months where defendant "under poor economic circumstances with an abusive father addicted to crack"); *United States v. Patzer*, 548 F. Supp. 2d 612 (N.D. Ill. 2008) (imposing 13 years despite Guidelines range of 346-411 months in career offender case, partly in consideration of defendant's difficult childhood with an abusive family and undiagnosed ADHD); *United States v. Mapp*, 2007 WL 485513 (E.D. Mich. Feb. 9, 2007) (granting variance based on defendant's upbringing where he frequently witnessed domestic violence and substance abuse by his parents until his grandmother took custody of him at age five); *United States v. McBride*, 511 F.3d 1293 (11th Cir. 2007) (affirming a downward variance from 151 to 188 months in prison to 84 months in prison in a child pornography case in which the District Court found the defendant's history of abuse and abandonment to be one of the worst ever seen by the court); *United States v. Somerstein*, 20 F. Supp. 2d 454 (E.D.N.Y. 1998) (granting a downward departure under U.S.S.G. § 5K2.0 based in part on defendant's experiences as child victim of the Holocaust); *United States v. Ayers*, 971 F. Supp. 1197 (N.D. Ill. 1997) (granting departure based upon cruel childhood with relentless physical, sexual and psychological abuse over course of years).

In light of Mr. Mohamud's history and characteristics, a concurrent 80-month sentence is warranted.

**C.** **Reflecting the Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment, Affording Adequate Deterrence, Protecting the Public from Further Crimes (18 U.S.C. §§ 3553(a)(2)(A), 18 U.S.C. § 3553(a)(2)(B), and Providing Effective Training, Care, and Treatment (18 U.S.C. § 3553(a)(2)(D))**

As discussed *supra*, the present offense is within the heartland of bank robbery cases. There is no evidence that Mr. Mohamud's *modus operandi* was particularly egregious in any respect. Thus, the need for the sentence imposed to reflect the seriousness of the offense does not require an aggravated sentence prison term.

As to promoting respect for the law, providing just punishment, and affording adequate deterrence, when Mr. Mohamud's life and offense are viewed against the backdrop of the enumerated sentencing considerations, it becomes clear that a concurrent sentence of 80 months is sufficient, but not greater than necessary. An 80-month sentence is consistent as a graduated punishment given his previously history of incarceration, *i.e.,* it will result in the longest sustained custodial sentence he has faced to date. Moreover, Mr. Mohamud has thus far not had the benefit of intensive mental health counseling or substance abuse treatment to address the root causes of his criminality, though he is now prepared to do so, at the very least to address alcohol abuse and dependency. (PSR ¶¶ 88, 90.) Mr. Mohamud has no history of substance dependency treatment (PSR ¶ 90) and would ask for a recommendation to complete the Residential Drug and Alcohol Program ("RDAP") while in the custody of the Bureau of Prisons.

True respect for the law, just punishment, and deterrence for Mr. Mohamud is only achievable through successful mental health and substance abuse treatment, inasmuch as his crimes—for which he bears the ultimate responsibility—are undoubtedly tied to his failure thus far to adequately address both latent mental health and chemical dependency issues. 80 months is sufficient time for Mr. Mohamud to complete such treatment and counseling in custody and to therefore afford adequate deterrence. Both sentencing courts and the Department of Justice itself have also cast grave doubts upon whether extended incarceration serves the purpose of deterrence.[5]

With regard to protecting the public from further crimes, even assuming *arguendo* a total offense level is 29 (PSR ¶ 26), the United States Sentencing Commission has found that "[t]here is not a strong correspondence between final offense level and recidivism." United States Sentencing Commission, *Recidivism Among Federal Offenders: A*

---

[5]     *See, e.g., United States v. Lawrence,* 254 F. Supp. 3d 441, 447 (E.D.N.Y. 2017) ("a long sentence will not achieve specific deterrence for the same reasons that it would not deter future . . . crimes in the community"; "[t]he key to both general and specific deterrence is the known risk of detection and punishment, not the length of the sentence"; "[t]he fact that defendant was apprehended and has already served a term of incarceration will provide more specific deterrence than would any additional term of incarceration"); U.S. Dept. of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence*, May 2016, *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf at 1-2 (last visited Nov. 5, 2019) ("sending an individual convicted of a crime to prison isn't a very effective way to deter crime;" "[p]rison is an important option for incapacitating and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes;" "increasing the severity of punishment does little to deter crime" because (1) "[t]he lack of any 'chastening' effect from prison sentences," (2) "prisons may exacerbate recidivism," (3) "[t]he different impacts of the certainty versus the severity of punishment on deterrence," and (4) "individuals grow out of criminal activity as they age").

*Comprehensive                  Overview*,                 *available                      at*
http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2016/recidivism_overview.pdf, at 20 (last visited Nov. 5, 2019).   Moreover,
the Commission's research shows that "[o]ffenders with shorter lengths of imprisonment
generally had lower recidivism rates."   *Id.* at 22.

Thus, Mr. Mohamud's sentence should not be increased beyond 80 months to satisfy
the foregoing sentencing considerations.   A concurrent 80-month sentence is sufficient to
achieve those goals.

**D.     The Need to Avoid Unwarranted Sentence Disparities (18 U.S.C. § 3553(a)(6))**

In fiscal year 2018, more than half (*i.e.*, 55%) of all cases sentenced under U.S.S.G.
§ 2B3.1 received below-range sentences, whereas only 38% of such cases received within-
range sentences and only 6% cases were above-range.   *See* United States Sentencing
Commission, *Table 32:   Sentence Imposed Relative To The Guideline Range By Primary
Sentencing     Guideline,     Fiscal     Year     2018* at  1,     *available      at*
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-
and-sourcebooks/2018/Table32.pdf (last visited Nov. 4, 2019) (reflecting 1,691 total
U.S.S.G. § 2B3.1 cases, with 648 within-range, 108 above-range, and 935 below-range
sentences).   The Sentencing Commission's data for the past five fiscal years further
indicates that average sentences have remained consistently below average Guideline
minimums for robbery offenses, and that within-range sentences have decreased,

particularly over the past two fiscal years, while variances have increased, with 89.7% of

such variances being below-range reductions of an average 33.4%:



United States Sentencing Commission, *Quick Facts:   Robbery Offenses, Fiscal Year*

*2018* at 2, *available* at https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/quick-facts/Robbery_FY18.pdf (last visit Nov. 4, 2019).   These statistics

support the sort of mid-to-low range sentence of 80-months sought by Mr. Mohamud

here as a means of vindicating the statutory mandate that the Court avoid unwarranted

sentencing disparities.

It is also worth noting that this case was originally charged in the Stearns County,

Minnesota District Court (No. 73-CR-19-2097), and that Mr. Mohamud would have pled

guilty in that matter but for its federal adoption. The state pre-plea sentencing worksheet suggested that Mr. Mohamud's range was from 49 to 68 months, with a presumptive commit to prison of 57 months.[6] Acknowledging that the need to avoid unwarranted sentencing disparities set forth in 18 U.S.C. § 3553(a)(6) looks towards a comparative analysis of federal sentences, *see, e.g., United States v. Nash,* 627 F.3d 693, 697 (8th Cir. 2010), Mr. Mohamud respectfully submits that the 80-month sentence he seeks here— nearly two years longer than his presumptive state sentence would have been—is sufficient but not greater than necessary in light of the foregoing. *See, e.g., United States v. Deegan*, 605 F.3d 625, 656-58 (8th Cir. 2010) (Bright, J. dissenting); *see also United States v. Wilkerson,* 411 F.3d 1 (1st Cir. 2005) (remanding for resentencing where district judge "repeatedly expressed his concern about disparate treatment between federal and state court sentences in similar cases, but stated that the Guidelines did not permit him to take that disparity into account").

## III.    CONCLUSION

Based on the foregoing, Mr. Mohamud hereby respectfully requests a concurrent sentence of 80 months as sufficient, but not greater than necessary to meet the statutory goals of sentencing. This substantial period of imprisonment, coupled with participation in RDAP and a term of supervised release will be sufficient, but not greater than necessary

---

[6]      Mr. Mohamud's state public defender noted that there may have been an error in the determination of his state criminal history score, and that if he had one less criminal history point, his range would have been 44 to 61 months with a presumptive commit to prison of 51 months.

given the nature and circumstances of this relatively unsophisticated and non-violent bank robbery, Mr. Mohamud's history and characteristics as a Somali refugee fleeing violence and poverty, his struggles to adjust to life in America without a father, his untreated mental health and chemical dependency issues, and the need to avoid unwarranted sentencing disparities.

Dated: November 5, 2019        Respectfully submitted,

*/s/Keala C. Ede*

_____
KEALA C. EDE
Attorney ID No. 387316
Attorney for Defendant
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415